IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| T&E INVESTMENT GROUP, LLC, | § | |
| D/B/A ROBERTS INVESTMENT | § | |
| GROUP, ET AL., | § | |
| | § | |
| Plaintiffs, | § | No. 3:11-cv-724-P |
| | § | (consolidated with No. 3:11-cv-1558-P) |
| V. | § | |
| | § | |
| CHRISTOPHER FAULKNER, ET AL., | § | |
| | § | |
| Defendants. | § | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION OF THE
UNITED STATES MAGISTRATE JUDGE**

Plaintiffs' Motion for Sanctions and Motion for Contempt Judgment [Dkt. No. 53] has been referred to the undersigned magistrate judge for hearing, report, and recommendation pursuant to 28 U.S.C. § 636(b). *See* Dkt. No. 74. The undersigned issues the following findings of fact, conclusions of law, and recommendation.

**Procedural History**

Plaintiffs T&E Investment Group, LLC and Timothy Roberts ("Plaintiffs") filed a motion for sanctions and for a contempt judgment. *See* Dkt. No. 53. In the motion, Plaintiffs sought sanctions against Defendants Christopher Faulkner, Breitling Oil and Gas Corporation, Parker Hallam, and Dustin Rodriguez a/k/a Michael Miller ("Defendants") for spoliation of evidence and asked that the Court hold Defendants in contempt for violating an Order on Motion to Compel entered by Judge Kaplan, dated November 9, 2011 (the "11/9/11 Order") [Dkt. No. 37].

The 11/9/11 Order required Defendants to permit Lance Fogarty, a jointly selected independent computer forensic expert and employee of Protegga LLC ("Protegga"), to have access to all of the computers used by Defendants during the year 2011, wherever located, for examination of the computers' hard drives. *See* Dkt. No. 37 at 1. The 11/9/11 Order stated that the examination should include, without limitation, examination of documents, writings, and metadata related to the postings and websites made the basis of this suit and a determination as to whether items have been deleted by Defendants or whether Defendants have used disk wiping programs to destroy evidence that at one time was reposed on computer hard drives. *See id.* at 1-2.

Defendants provided Fogarty with two computers on November 17, 2011 and with five additional computers on November 18, 2011. *See* Dkt. No. 53-1 at 8 of 107.

Fogarty signed a report dated February 24, 2012 [Dkt. No. 53-1] (the "Initial Report"). The report found that Defendants had spoliated data on several computers by (1) deleting URLs in the registry key on November 17, 2011 on the computer identified as BRT-Breitling-PCL-02 ("PCL-2"); (2) by downloading, installing, and executing PC Optimizer Pro (a program with the ability to permanently delete files) on November 14, 2011 and November 15, 2011 on the computer identified as BRT-Breitling-PCL-02; (3) by using a software program called a bulk file changer on the computers identified as BRT-Breitling-PCL-03 ("PCL-3") and BRT Breitling-PCL-06 ("PCL-6"); and (4) by connecting an external hard drive to PCL-3 and PCL-6. Fogarty also determined that a number of computers, smart phones, and tablets were used by Defendants in 2011 but withheld from the examination. *See* Dkt. No. 53-1.

Based on the contents of the Initial Report, Plaintiffs filed a motion for sanctions and motion for contempt judgment on May 3, 2012. *See* Dkt. No. 53.

On June 8, 2012, Judge Kaplan, pursuant to a letter from Plaintiffs, and with no objection from Defendants, ordered Defendants to turn over five additional computers to Fogarty. *See* Dkt. No. 62 at 1. Judge Kaplan ordered Fogarty to complete his examination of the new computers by June 26, 2012 and permitted Plaintiffs to supplement their motions for sanctions based on any new information by June 29, 2012. *See id.* Plaintiffs did not supplement their motion by the deadline, and Judge Kaplan informed the parties that, as a result, "the court will consider only the spoliation issues identified by plaintiffs and their forensic expert, Lance Fogarty, for the following computers: (1) BRT-Breitling-PCL-02; (2) BRT-Breitling-PCL-03; (3) BRT-Breitling-PCL-06." Dkt. No. 65 at 1. Accordingly, as Plaintiffs' counsel has acknowledged, Plaintiffs' request for a contempt judgment for violating Judge Kaplan's 11/9/11 Order is no longer pending before the Court on Plaintiff's motion. *See* Dkt. No. 104, 2:18-24.

Defendants filed a response to Plaintiffs' Motion for Sanctions, denying spoliation and stating that they had fully complied with the 11/9/11 Order. *See* Dkt. No. 66. Defendants hired their own expert, G-C Partners, who prepared a report that Defendants attached to their response. *See* Dkt. No. 66-1. Defendants also accused Fogarty of bias. *See* Dkt. No. 66 at 1. Plaintiffs filed a reply in support of their motion. *See* Dkt. No. 67.

The undersigned held an evidentiary hearing on May 2, 2013, at which Fogarty and Defendant Christopher Faulkner testified. *See* Dkt. Nos. 102 & 104. After the hearing, Fogarty called the undersigned's chambers and informed the undersigned's staff of certain conclusions that he reached, on his own initiative, regarding the veracity of Defendant Faulkner's testimony at the May 2, 2013 hearing on Plaintiffs' Motion for Sanctions.[1] At the undersigned's direction, Fogarty submitted a supplemental report [Dkt. No. 109-1] (the "Supplemental Report") to the Court and, pursuant to the Court's order, to the parties. *See* Dkt. No. 103; Dkt. No. 109.

The undersigned then held oral argument on May 16, 2013 to hear each party's position on the Supplemental Report, including each party's views on (1) the propriety of the Court's considering Fogarty's Supplemental Report in connection with Plaintiffs' Motion for Sanctions [Dkt. No. 53] and (2) the appropriate procedure and additional proceedings, if any, that the Court should order and implement if it were to consider the substance of the Supplemental Report in connection with Plaintiffs' Motion for Sanctions. *See* Dkt. Nos. 103 & 105. The parties appeared to agree that the undersigned had the ability to reopen the evidence to hold a second evidentiary hearing.

After the May 16, 2013 oral argument, the undersigned issued an order setting a second evidentiary hearing, which was held on June 3, 2013. *See* Dkt. Nos. 106 &

---

[1]     Although Mr. Fogarty has been appointed by the Court in this case, neither the undersigned nor his chambers staff asked Mr. Fogarty to undertake this effort or communicated with Mr. Fogarty, outside of the hearing itself, prior to his phone call to the undersigned's chambers on the morning of May 3, 2013.

107. Only Fogarty testified at the second evidentiary hearing, although the parties had the ability to call additional witnesses. *See* Dkt. No. 106 at 2.

For the reasons set forth below, the undersigned recommends that Plaintiff's Motion for Sanctions be granted in part, that the jury receive an adverse inference instruction, and that the Court impose on Defendants a monetary sanction payable to Plaintiffs in an amount of $27,500, which is a reasonable estimate of the portion of Fogarty's fees that Plaintiffs have been invoiced for Protegga's investigation into whether, and to what extent, Defendants spoliated evidence.

## Facts

Although the Initial Report finds several incidences of spoliation (discussed *infra*), the undersigned determines that only one incident meets the elements of spoliation under the applicable law, and the evidentiary hearings focused almost entirely on this issue. As detailed in the Initial Report, Fogarty discovered evidence of a software program called a bulk file changer being used on PCL-3. A bulk file changer allows the user to change the metadata for multiple files at one time. *See* Dkt. No. 53 at 4.

At the hearing, Fogarty testified that PCL-3 was, based on its user history, primarily used by Tamra Friedman, Defendant Faulkner's wife. *See* Dkt. No. 104, 21:8-11. PCL-3 contained two profiles: "Tamra-PC", which was the administrator, and a second profile called "Chris." The "Chris" profile was created on November 15, 2011, *see* Dkt. No. 53-1 at 16 of 107; however, a bulk file changer was used to make the

profile appear to have been created in 2009, *see* Dkt. No. 104, 21:11-18. Fogarty testified that he could not think of a legitimate business or personal reason for Defendant Faulkner to have used a bulk file changer on PCL-3 as he did and that he had asked, without result, for Defendants to supply him with such a reason. *See id.*, 38:22-24. Fogarty also testified that a large amount of data from an external hard drive was transferred onto PCL-3, *see id.*, 20:24-21:5, on November 15, 2011, *see* Dkt. No. 53-1 at 16 of 107. Fogarty hypothesized that Defendant Faulkner attempted to "make it look like [PCL-3] was his computer that he used all the time. When the reality is based on all the email traffic that I saw there [were] other computers he was using that we haven't received." Dkt. No. 104, 21:17-22.

Specifically, Fogarty believes that Defendant Faulkner attempted to make PCL-3 look like his own computer because he failed to turn over a computer named "Alienware." *See id.*, 55:4-6. Fogarty testified that the evidence shows that the Alienware computer was last used on November 10, 2011 inside the Faulkner home. *See id.* Fogarty also testified that Defendant Faulkner sent emails from the Alienware computer. *See* Dkt. No. 108, 18:24-19:4, 41:15-42:15. Fogarty explains more fully in his Supplemental Report that, on November 10, 2011, the Alienware computer connected to PLC-3 and that the computers had IP addresses within the same subnet and wireless network ID. *See* Dkt. No. 109-1 at 2 of 6. From this information, Fogarty concluded that "both of these computers were in the same location, likely the Faulkner home." *Id.* The Alienware computer also remotely connected to the computer identified

as BRT-Breitling-PCD-05 on September 30, 2010. *See* Dkt. No. 53-1 at 24 of 107.

Defendant Faulkner acknowledged that he had used a bulk file changer on PCL-3 but explained that he had not intended to use the program to change the date on which his profile was created but rather had used it to make the files that he copied from the external hard drive read-only. *See* Dkt. No. 104, 61:22-62:4. Defendant Faulkner described the files that he uploaded as investor files, including "a lot of photos, PDF's Word documents, just standard stuff that we update our investor base with." *Id.*, 63:15-20. Defendant Faulkner explained that he wanted to make the files read-only so that his wife – who was angry with him at the time – would not delete the files to sabotage him. *See id.*, 62:1-15. However, Defendant Faulkner acknowledged on cross-examination that read-only files could be deleted. *See id.*, 88:3-5, 17-20. Although Defendant Faulkner appeared to insinuate that extra steps are required to delete a read-only file, *see id.*, Defendants offered no proof to support this assertion. In addition, Fogarty testified that there are no extra steps or knowledge required to deleted a read-only file – "all you have to do is click on it and hit delete." Dkt. No. 108, 25:7-8.

Defendant Faulkner also acknowledged that the bulk file changer had "probably" changed the date of his profile but stated that it was "not my intent" to change the date. Dkt. No. 104, 90:12-23. Defendant Faulkner admitted that he and his wife were the only people with access to PCL-3 and that his wife was "not very computer literate." *Id.*, 90:24-91:4.

Defendant Faulkner testified that he had produced every computer that he

thought complied with the Court's 11/9/11 Order and that was in his possession, custody, or control. *See id.*, 64:13-16. Defendant Faulkner explained, however, that he may have accessed other computer terminals that were not in his possession, custody, or control, such as when he was at his mother's house or while traveling, and that he may have accessed computers remotely that were stored at his former place of business. *See id.*, 64:17-65:3.

Defendant Faulkner further testified that the IP address Fogarty linked to the "Alienware" computer belonged to the service provider Covad Communication, while Defendant Faulkner used the service provider Megapath. *See id.*, 72:15-75:2.

After the evidentiary hearing, Fogarty issued his Supplemental Report as described above. The Supplemental Report is the result of Fogarty's attempts "to validate several claims made by [Defendant] Faulkner" at the evidentiary hearing. Dkt. No. 109-1 at 2 of 6. Fogarty concluded that Defendant Faulkner made false statements as to three separate issues in his testimony.

First, Fogarty explained that he had looked up the IP address associated with the Alienware computer and determined that, while the IP address was owned by Covad Communications, it was registered to Megapath Corporation. Fogarty also noted that he had found a press release, dated September 1, 2010, announcing the finalization of the corporate merger of Megapath, Covad Communications, and Speakeasy. *See id.*

Second, Fogarty asserts that the majority of the documents that Defendant Faulkner copied onto PCL-3 using the external hard drive were not documents for

Breitling investor files, as Defendant Faulkner testified, but rather personal photographs of parties and Trend Micro (Mrs. Freidman's employer) documents. *See id.* at 2-3 of 6. However, Fogarty acknowledges that a portion of the copied files – constituting less than 0.06 percent of the total size of data copied to PCL-3 – concerned Breitling Oil and Gas. *See id.*

Finally, Fogarty reports that Protegga investigated the use of the bulk file changer on PCL-3 and determined that someone had manually changed the dates of the uploaded files on November 18, 2011, after a failed attempt on November 15, 2011. *See* Dkt. No. *id.* at 4-5 of 6. And none of the files' attributes had been changed to read-only. *See id.* at 5-6 of 6.

At the second evidentiary hearing on June 3, 2013, Defendants made no attempt to contradict the factual assertions in Fogarty's Supplemental Report. Defendant Faulkner was present at the hearing but did not testify.

## Legal Standards

Plaintiffs rely on the Court's inherent powers to control litigation as the basis for the requests in their Motion for Sanctions. In order to exercise its inherent powers, the Court must find that the guilty party disposed of evidence in bad faith that resulted in prejudice to the judicial process. *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 45-46 (1991). In *Chambers*, the United States Supreme Court held that, in certain circumstances, federal courts have inherent powers to sanction. *See id.* at 44-45. These inherent powers "ought to be exercised with great caution," *id.* at 43 (internal

quotation marks omitted), and are reserved for "conduct which abuses the judicial process," *id.* at 44-45. "The threshold for the use of the inherent power sanction is high." *Natural Gas Pipeline Co. of Am. v. Energy Gathering, Inc.*, 86 F.3d 464, 467 (5th Cir. 1996). A court's inherent powers to sanction "may be exercised only if essential to preserve the authority of the court," *id.*, and only when the court "finds that 'fraud has been practiced upon it, or that the very temple of justice has been defiled,'" *Boland Marine & Mfg. Co. v. Rihner*, 41 F.3d 997, 1005 (5th Cir.1995) (quoting *Chambers*, 501 U.S. at 46). "Because of their very potency, inherent powers must be exercised with restraint and discretion." *Chambers*, 501 U.S. at 44.

Spoliation of evidence is among the range of conduct for which a court may assess sanctions using its inherent powers. *See Hodge v. Wal-Mart Stores*, Inc., 360 F.3d 446, 449 (4th Cir. 2004) ("The imposition of a sanction ... for spoliation of evidence is an inherent power of federal courts."); *accord Union Pump Co. v. Centrifugal Technology Inc.*, 404 F. App'x 899, 905 (5th Cir. 2010). "Spoliation is the destruction or material alteration of evidence or ... the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *Ashton v. Knight Transp., Inc.*, 772 F. Supp. 2d 772, 799 (N.D. Tex. 2011) (internal quotation marks omitted).

"The party seeking the spoliation sanction bears the burden of proof." *Id.* at 800. The elements of spoliation in the Fifth Circuit are: (1) a duty to preserve the information; (2) a culpable breach of that duty; and (3) resulting prejudice to the innocent party. *See id.*; *see also Rimkus Consulting Group v. Cammarata*, 688 F. Supp.

2d 598, 612-16 (S.D. Tex. 2010) (to obtain sanctions for spoliation of evidence, a party must establish "(1) the party with control over the evidence had an obligation to preserve it at the time it was destroyed; (2) the evidence was destroyed with a culpable state of mind; and (3) the destroyed evidence was 'relevant' to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense.").

Turning to the first element, "[a] duty to preserve arises when a party knows or should know that certain evidence is relevant to pending or future litigation." *Ashton*, 772 F. Supp. 2d at 800.

As for culpability, although the level of culpability required for spoliation is not yet settled within the Fifth Circuit, a showing of bad faith or wilful abuse of the judicial process is required for the Court to exercise its inherent powers. *See id.* In addition, in the Fifth Circuit, "the circumstances of the act [of spoliation] must manifest bad faith" before severe sanctions are available. *Vick v. Texas Emp't Comm'n*, 514 F.2d 734, 737 (5th Cir. 1975). Bad faith has been defined "as conduct involving 'fraudulent intent and a desire to suppress the truth.'" *Ashton*, 772 F. Supp. 2d at 800-01 (quoting *Consol. Aluminum Corp. v. Alcoa, Inc.*, 244 F.R.D. 335, 344 (M.D. La. 2006)).

The prejudice element requires that the spoliated evidence be relevant to the lawsuit and that the spoliated evidence it would have supported the inference sought by the moving party. *See Rimkus*, 688 F. Supp. 2d at 616. However, courts recognize

that "[t]he burden placed on the moving party to show that the lost evidence would have been favorable to it ought not to be too onerous, lest the spoliator be permitted to profit from its destruction." *Id.* (internal citations omitted). Courts are not uniform in their application of the prejudice requirement, and "[t]he Fifth Circuit has not explicitly addressed whether even bad-faith destruction of evidence allows a court to presume that the destroyed evidence was relevant or its loss prejudicial. Case law in the Fifth Circuit indicates that an adverse inference instruction is not proper unless there is a showing that the spoliated evidence would have been relevant." *See id.* at 617 (citing *Condrey v. SunTrust Bank of Ga.*, 431 F.3d 191, 203 & n.8 (5th Cir. 2005)). But at least one court within the Fifth Circuit has held that bad faith destruction of evidence "alone is sufficient to demonstrate relevance." *Consol. Aluminum Corp.*, 244 F.R.D. at 340 n.6. In any case, courts have permitted parties to demonstrate that the spoliated evidence would have helped the moving party through circumstantial evidence. *See Ashton*, 772 F. Supp. 2d at 804 ("In sum, the totality of the circumstantial evidence surrounding the Defendants' actions, as recounted in detail throughout this opinion, would permit a reasonable fact finder to conclude that the missing evidence would have aided Plaintiff in proving her claims."); *Yelton v. PHI, Inc.*, 279 F.R.D. 377, 393 (E.D. La. 2011) ("[G]iven the facts and circumstances presented here, the Court finds that PHI has carried its limited burden of demonstrating that the lost documents would have been relevant.").

Prejudice is also a question of degree. When a party is irreparably prejudiced by

the bad faith destruction of evidence, striking the pleadings may be appropriate. *See, e.g.*, *Ashton*, 772 F. Supp. 2d at 805. However, "[w]hen a party is prejudiced, but not irreparably, from the loss of evidence that was destroyed with a high degree of culpability, a harsh but less extreme sanction than dismissal or default is to permit the fact finder to presume that the destroyed evidence was prejudicial." *Rimkus*, 688 F. Supp. 2d at 618.

## Analysis

### A. Duty to Preserve

There can be no serious dispute that Defendants were under a duty to preserve the evidence at issue, including PCL-3, the Alienware computer, and any other computer used by Defendants in 2011 in their possession, custody, or control.[2] Defendants were under a court order to provide to Fogarty "access to all of the computers used by the defendants during the year 2011, wherever located, for examination of their hard drives." Dkt. No. 37 at 1. Fogarty determined that the Alienware computer was used by Defendant Faulkner in 2011, likely at the Faulkner home, and Defendants voluntarily submitted PCL-3 to Fogarty for examination. Faced

---

[2]     The undersigned notes that, as described above, only Defendants' conduct with regard to PCL-2, PCL-3, and PCL-6 remains within the scope of the conduct that is allegedly the spoliation that is grounds for sanctions under Plaintiff's Motion for Sanctions. *See* Dkt. No. 65. Therefore, Defendants' failure to produce the Alienware computer or other relevant evidence beyond PCL-2, PCL-3, and PCL-6 is beyond the scope of the undersigned's Findings, Conclusions, and Recommendation on Plaintiff's motion as a basis, in and of itself, for sanctions or, for that matter, contempt. However, a finding that Defendants manipulated data on PCL-3 in order to avoid production of the Alienware computer or any other relevant evidence remains a viable ground for sanctions.

with the 11/9/11 Order, Defendants unquestionably had a duty to preserve the data contained on PCL-3 – which means not manipulating the metadata, as Defendant Faulkner admittedly did – and to preserve the Alienware computer. *See* Dkt. No. 108, 18:19-19:4.

While Defendants did, at both evidentiary hearings, vigorously question Fogarty's conclusion that the Alienware computer was located within the Faulkner home, the evidence overwhelmingly supports Fogarty's determination. *See* Dkt. No. 108, 26:8-27:1; Dkt. No. 109-1 at 2 of 6. The undersigned also notes that Fogarty was in all respects a credible witness. In any case, it is simply not credible that Defendant Faulkner could not identify a computer that he had previously used, that connected in the same subnet and wireless network ID as his wife's computer, and that, a day after Judge Kaplan issued the 11/9/11 Order, made a secure connection to his wife's computer. *See* Dkt. No. 108, 18:19-19:4.

B.    Culpability

The totality of the evidence presented at the evidentiary hearings and in Fogarty's reports establishes that Defendant Faulkner acted in bad faith. The uncontroverted evidence demonstrates that the Alienware computer, using an IP address within the same subnet and wireless network ID as PCL-3, made a secure connection to PCL-3 on November 10, 2011, the <u>day after</u> the 11/9/11 Order on the Motion to Compel, and that the Alienware computer was never provided to Fogarty. While the failure to turn that computer over as required by Judge Kaplan's 11/9/11 Order now is not, standing alone, a basis for sanctions on Plaintiffs' motion, the

-14-

evidence shows that PCL-3 was manually altered, using a bulk file changer, to make the "Chris" profile appear to have been created in 2009 and that certain files were likewise manually altered.

Defendant Faulkner testified that he only intended to use the bulk file changer to make certain files "read-only." However, Fogarty's uncontroverted statements in his Supplemental Report and rebuttal testimony demonstrate that Defendant Faulkner's testimony was false, because any dates must have been changed manually and because no files' attributes were actually changed to read-only. In light of all the evidence and circumstances presented to the undersigned, Defendant Faulkner was not a credible witness at the first evidentiary hearing on May 2, 2013, and the undersigned concludes that he made false statements in his testimony at that hearing concerning the use of the bulk file changer.

On the other hand, the undersigned cannot find from the evidence presented that Defendant Faulkner made false statements on the remaining two issues cited in the Supplemental Fogarty Report. First, Defendant Faulkner acknowledged that he could not be certain that Megapath and Covad were not working together and that he was testifying only that he did not believe that they were. *See* Dkt. No. 104, 81:7-14. Second, although Defendant Faulkner may have mischaracterized or exaggerated the extent to which the files he uploaded until PCL-3 were related to Breitling Oil & Gas investor files, at least some of the files uploaded matched the description to which Defendant Faulkner testified. Therefore, it is not implausible that Defendant Faulkner simply misremembered the exact contents of his file upload.

Nevertheless, the record shows that Defendant Faulkner altered metadata on PCL-3 in an apparent effort to make it appear that he had used PCL-3 – which does not contain files that relate to the subject matter of this lawsuit – for a number of years, when in fact it was his wife's computer, and that he made false statements to the Court about doing so. The evidence also demonstrates that Defendant Faulkner did so in the context of Defendants' having failed to turn over a computer that Defendant Faulkner had used in 2011 and that made a secure connection to PCL-3 using an IP address within the same subnet and wireless network ID as PCL-3. Defendant Faulkner's false statements to the Court and manipulation of evidence that he was under a court order to preserve, apparently to further an effort to conceal additional evidence that he was under a court order to produce, are sufficient to establish bad faith.

C.   <u>Prejudice</u>

Prejudice is the most difficult element for Plaintiffs to meet. There is no dispute that the files on PCL-3 – including those as to which Defendant Faulkner used the bulk file changer to alter their metadata – did not relate to the subject matter of this lawsuit. *See* Dkt. No. 104, 37:19-22. And, insofar as Plaintiffs assert that the alteration of PCL-3 is sanctionable where it was manipulated in order to hide the Alienware computer, because the Alienware computer was never produced for inspection, it is impossible for Plaintiffs to prove directly that the Alienware computer's contents were relevant to the litigation and would have been helpful to Plaintiffs in proving their claims. Moreover, Fogarty's Initial Report contained dozens of pages of relevant

evidence that Plaintiffs have characterized as supportive of their claims. *See* Dkt. No. 53 at 4. Therefore, Plaintiffs cannot be said to be <u>irreparably</u> prejudiced.

Nevertheless, this situation presents "the difficulty and potential for unfairness" that courts have recognized can exist for an innocent party seeking to show that information lost through spoliation is relevant and prejudicial. *Rimkus*, 688 F. Supp. 2d at 616. However, it is not difficult to conclude, based on "the totality of the circumstantial evidence" surrounding Defendant Faulkner's actions, as detailed in these findings and conclusions, that a reasonable fact finder could conclude that the Alienware computer contained information that was relevant and would have aided Plaintiffs in proving their claims. *Ashton*, 772 F. Supp. 2d at 804. Additionally, the fact that Defendant Faulkner sent emails from his work address from the Alienware computer during the relevant time period in the 11/9/11 Order further supports a finding that the Alienware computer would have contained relevant information.[3] *See* Dkt. No. 53-1 at 25 of 107.

The undersigned finds that the requisite prejudice is established from Defendants' bad faith spoliation of PCL-3 and the data thereon in the face of the 11/9/11 Order in an apparent effort to conceal the existence and significance of the Alienware computer. Defendants have objected that a request for sanctions for a failure to turn the Alienware computer over to Fogarty in response to the 11/9/11 Order is

---

[3]   The undersigned notes that the email cited in the Initial Report does not appear to be relevant; however, it supports a finding that the Alienware computer was used by Defendant Faulkner for work-related matters.

beyond the scope of Plaintiffs' Motion for Sanctions as it currently stands. But the undersigned is of the view that that failure is not itself the sanctionable spoliation but is a related circumstance that cannot be disentangled from Defendants' spoliation of PCL-3 (a computer clearly at issue on Plaintiffs' Motion for Sanctions) – and need not be, for present purposes, where Defendants had ample opportunity to present evidence and cross-examine Fogarty regarding the Alienware computer's existence, significance, and location at both evidentiary hearings.

Accordingly, the undersigned finds that Plaintiffs have been prejudiced by Defendants' bad faith spoliation of PCL-3.

D.   <u>Remedy</u>

"Courts have broad discretion in crafting a remedy that is proportionate to both the culpable conduct of the spoliating party and resulting prejudice to the innocent party," including awarding attorneys' fees, deeming certain facts admitted, giving the jury an adverse inference instruction, striking pleadings, entering a default judgment, and dismissing the case entirely. *Ashton*, 772 F. Supp. 2d at 801 (citing *Anadarko Petroleum Corp. v. Davis*, No. H-06-2849, 2006 WL 3837518, at *27 (S.D. Tex. Dec. 28, 2006)). However, in choosing the appropriate remedy, a court must ensure that it is "no harsher than necessary to respond to the need to punish or deter and to address the impact on discovery." *Id.* (internal quotation marks omitted). The appropriate sanction should "(1) deter parties from engaging in spoliation; (2) place the risk of an erroneous judgment on the party who wrongfully created the risk; and (3) restore the prejudiced party to the same position he would have been in absent the wrongful destruction of

evidence by the opposing party." *Id.* (internal quotation marks omitted).

Here, because the prejudice suffered by Plaintiffs does not appear to make the challenge of proving their claims insurmountable, it would be inappropriate, as Plaintiffs have requested, to strike Defendants' pleadings. *See Rimkus*, 688 F. Supp. 2d at 644 ("The sanction of dismissal or default judgment is appropriate only if the spoliation or destruction of evidence resulted in 'irreparable prejudice' and no lesser sanction would suffice.").

Rather, considering all the relevant factors for choosing the appropriate remedy from the range of possible sanctions, the undersigned recommends that the jury be given a spoliation instruction that would entitle the jury to draw an adverse inference that a party who intentionally spoliated evidence did so in order to conceal evidence that was unfavorable to that party. *See generally Whitt v. Stephens County*, 529 F.3d 278, 284 (5th Cir. 2008). This is an appropriate remedy where the Fifth Circuit permits an adverse inference "upon a showing of 'bad faith' or 'bad conduct.'" *Condrey*, 431 F.3d at 203. Such an instruction will serve the important interests of deterring similar conduct, placing on Defendants the risk of any erroneous judgment, and restoring Plaintiffs to a position in which they would have been absent the bad faith spoliation.

Further, like an adverse inference instruction, a monetary sanction can deter spoliation and compensate the moving party for additional costs incurred. *See Rimkus*, 688 F. Supp. 2d at 647-48. In this case, Plaintiffs incurred additional costs when Fogarty continued to investigate evidence of spoliation by Defendants. The undersigned recommends that Plaintiffs recover from Defendants as sanctions an

amount that is a reasonable estimate of the portion of Fogarty's fees that Plaintiffs have been invoiced for Protegga's investigation of Defendants' spoliation.

Specifically, Fogarty billed Plaintiffs a total of $50,119.76 for his services as an independent expert, including a $5,412.50 retainer for his services at the May 2, 2013 evidentiary hearing. At the May 2, 2013 evidentiary hearing, Fogarty testified that Protegga's spoliation investigation caused his fees to be "at least double" of what they would have been absent the spoliation allegations. Dkt. No. 104, 30:10-22.

As such, and taking into account additional fees that Fogarty may have accrued for his work on the Supplemental Report and testimony at the June 3, 2013 evidentiary hearing, the undersigned recommends that Defendants be sanctioned in the amount of $27,500. The undersigned finds that, under the particular circumstances of this case, a $27,500 sanction is not overly harsh but restores Plaintiffs to a position in which they would have been but for certain costs that they incurred based on Defendants' bad faith conduct.

E.    Remaining Allegations of Spoliation

While the undersigned finds that the remaining allegations of spoliation by Fogarty and Plaintiffs do not meet the elements of spoliation, the undersigned will address these allegations for the sake of completeness.

First, Plaintiffs allege, based on the Initial Report, that the NTUser.dat file from PCL-2 shows that the URLs in the Typed URLs registry key were deleted on November 17, 2011, at 9:14 a.m. *See* Dkt. No. 53 at 3. Defendants asserted in their Response that G-C Partners recovered the deleted URLs and that they are all irrelevant. *See* Dkt. No.

66 at 3. At the hearing, Fogarty agreed that he was able to determine that none of the deleted URLs were related to the subject matter of this lawsuit. *See* Dkt. No. 104, 36:6-8. As such, this allegation clearly fails to satisfy at least the prejudice element required for spoliation.

Plaintiffs also allege, based on the Initial Report, that a program called PC Optimizer Pro was downloaded, installed, and executed on November 14, 2011 and executed again on November 15, 2011 on PCL-2. *See* Dkt. No. 53 at 3. PC Optimizer Pro is a suite of software tools that optimizes a computer's performance by, among other things, cleaning the Windows registry, removing all traces of one's Internet history, and ensuring that files are fully erased and unrecoverable. *See id.* According to the developer's website (www.pcoptimizerpro.com), the File Shredder tool "can permanently delete files from your disk without the possibility of them ever being recovered." *Id.*

Defendants responded in their briefing that G-C Partners determined that PC Optimizer Pro was not used to delete files. *See* Dkt. No. 66 at 4. Further, Defendants cite to two declarations – from Matthew Rapoport (Breitling's IT director) and Parker Hallam – that state that the program was used to clear up viruses that were causing problems with Hallam's computer. *See id.* at 4 & Exs. B & C. G-C Partners also created a "Volume Shadow Copy data set" to compare files prior to the PC Optimizer Pro's installation and after. G-C Partners concluded that all of the "user created files" (that is, "word processing, spreadsheets, PDF, graphics, music, or other types of files that

users typically interact with") that exist in the Volume Shadow Copy backup also exist as Active files on the current system. *Id.* at 7. However, Outlook could not be matched because new emails were received. *See id.* at 8.

Finally, G-C Partners tested the PC Optimizer Pro's file shredder function and determined that it would leave artifacts behind. G-C Partners uncovered no artifacts that would suggest that files were tampered with. *See id.* At the evidentiary hearing, Fogarty admitted that he did not find any evidence that PC Optimizer Pro's file shredder (or "wiping") function had been used on PCL-2. *See* Dkt. No. 104, 42:13-19. Although Fogarty vigorously disputed that PC Optimizer Pro would ever be used as an anti-virus program, *see id.*, 45:7-46:3, Fogarty could not demonstrate that PC Optimizer Pro was used to delete files on PCL-2, *see id.*, 53:20-54:16. While Fogarty stated that "[t]here was information removed," he acknowledged that it could be recovered forensically. *Id.*, 53:24-25. He further stated that, due to some payment issues, he did not fully evaluate the G-C Partners report and was therefore unable to dispute its findings. *See id.*, 104:54:9-16. As such, there is insufficient evidence to demonstrate that evidence was destroyed, much less evidence relevant to the case.

In addition, the Initial Report states that the bulk file changer was used on PCL-6 and that an external hard drive connected to PCL-6. *See* Dkt. No. 53-1 at 18 of 107. However, the record lacks sufficient detail to support allegations of spoliation of PCL-6 by Defendants.

Finally, Plaintiffs allege that there is evidence that numerous computers and

other devices were used by Defendants in 2011 and not provided to examiner. However, as discussed *supra*, this issue has been resolved by a prior order. *See* Dkt. No. 65.

## Recommendation

Plaintiffs' Motion for Sanctions and Motion for Contempt Judgment [Dkt. No. 53] should be granted in part and denied in part. The jury should be given an instruction of adverse inference on the issue of spoliation, and Plaintiffs should be awarded from Defendants a monetary sanction of $27,500, which is a reasonable estimate of the portion of Fogarty's fees that Plaintiffs have been invoiced for Protegga's investigation into whether, and to what extent, Defendants spoliated evidence.

A copy of these findings, conclusions, and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions, and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions, and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v.*

*United Services Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

DATED: July 5, 2013

_____

DAVID L. HORAN
UNITED STATES MAGISTRATE JUDGE