## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **T & E INVESTMENT GROUP, LLC** | § | |
| **d/b/a ROBERTS INVESTMENT** | § | |
| **GROUP and TIMOTHY ROBERTS,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **vs.** | § | **3:11-CV-0724-P** |
| | § | **(consolidated with 3:11-cv-1558-P)** |
| **CHRISTOPHER FAULKNER,** | § | |
| **BREITLING OIL AND GAS** | § | |
| **CORP., PARKER HALLAM** | § | |
| **and DUSTIN RODRIGUEZ** | § | |
| **a/k/a MICHAEL MILLER,** | § | |
| | § | |
| **Defendants.** | § | |

## JOINT PRETRIAL ORDER

## I.      APPEARANCE OF COUNSEL

For Plaintiff, T & E Investment Group, LLC d/b/a Roberts Investment

Group and Timothy Roberts ("T&E"):

MARK A. HENDRIX   (#09460500)
**KRAGE & JANVEY, L.L.P.**
2100 Ross Avenue, Suite 2600
Dallas, Texas 75201
214-397-1914
Facsimile:  214-220-0230
Email:  mhendrix@kjllp.com

## ATTORNEYS FOR PLAINTIFFS

For Defendants, Christopher Faulkner, Breitling Oil and Gas Corp., Parker Hallam and Dustin Rodriguez (collectively, "Defendants"):

LAWRENCE J. FRIEDMAN  (#07469300)
RYAN K. LURICH (#24013070)
R. BRIAN SHIELDS (#24056310)
**FRIEDMAN & FEIGER, L.L.P.**
5301 Spring Valley Road, Suite 200
Dallas, Texas 75240
972-788-1400
Facsimile:  972-776-5313
Email:  lfriedman@fflawoffice.com
        rlurich@fflawoffice.com
        bshields@fflawoffice.com

## II.   STATEMENT OF THE CASE

### A.   Plaintiffs' Statement of the Case

1.     This action arises under a federal statute specifically 15 U.S.C. §§ 1051, *et seq.*  This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1338, and under 15 U.S.C. § 1121.  The Court has jurisdiction over the Texas state law claims under principles of pendent and ancillary jurisdiction.

2.     Upon information and belief, each of the individual defendants resides in the Northern District of Texas; all or a substantial part of the events pleaded hereinafter that give rise to the claims stated in this complaint occurred in the Dallas Division of the Northern District of Texas.

3.     RIG is and has been since 2005 in the business of soliciting investments in oil and gas drilling operations by acquiring leases and selling

undivided working interests to accredited investors. Parker Hallam ("Hallam") and Dustin Rodriguez ("Rodriguez") are former employees of RIG.

4.     RIG was formed by Timothy Roberts and his wife in Texas in 2005 and since that time has continuously used the trade name "Roberts Investment Group".  RIG maintains and uses a logo "R [symbol of drilling rig] G" underneath which is spelled out "Roberts Investment Group".  RIG has used this logo and used its trade name on letterhead and other publications and advertisements continuously since 2005.  No other person or company in Texas has used said name or logo prior to the use by Plaintiffs.

5.     On or about October 2, 2009, Hallam and Rodriguez quit their employment with RIG.   Prior to resigning from RIG, they combined with Christopher Faulkner to form Breitling Oil and Gas Company ("Breitling") on or about September 28, 2009.  Breitling is a competitor of RIG in the same general business enterprise.  Faulkner, Hallam and Rodriguez are officers and directors of Breitling; their conduct and activities complained of herein were committed for the benefit of Breitling, to gain an unfair competitive advantage to plaintiffs' business.

6.     Sometime prior to June 1, 2010, Faulkner, personally or through his wife, acquired approximately 20 websites using variations of RIG and Timothy Roberts as the domain names.   Two of the websites are named "RobertsInvestmentGroupInfo.com" and "TimRobertsOil&Gas.com".  Using these

internet domain sites, Faulkner acting on behalf of Breitling, and with the assistance and aid of Hallam and Rodriguez, began publishing defamatory, false and malicious information regarding Roberts and the business enterprise of RIG on the internet.  The URLs were so situated such that if a member of the public used a search engine such as Google or Yahoo to search for the name Roberts, Tim Roberts, Roberts Oil and Gas, or Roberts Investment, the URLs acquired by Faulkner and Breitling would be the first few that would be published by the search engine.  The information contained on the URLs typically began by using the stolen logo of RIG identified hereinabove and indicated, at first blush, that the information being published was from Roberts Investment Group.      The information is false, malicious and defamatory and ends with the following phrase **"DO NOT INVEST WITH ROBERTS INVESTMENT GROUP, TIM ROBERTS OR ELISA ROBERTS.  THEY ARE CROOKS!!!"** and ends at the bottom of the page with the phrase **"INVESTORS BEWARE!!!!!!"**.  Other URL publications illegally planted by Faulkner begin with the Roberts Investment Group logo and defame one of its employees, Brad Pratt, and defame the business enterprise of Roberts and his company. They likewise end with **"INVESTORS BEWARE!!!!!!!!!!!!!!!!!"**.  (See Affidavit of Timothy Roberts attached hereto as **Exhibit A**, and incorporated herein as if set forth in verbatim.)

7.     Faulkner attempted to disguise the author of the information on some of these pirated URLs by identifying the author as "Nathan Vaughn", a lawyer in the State of Ohio.  [Mr. Vaughan's name is correctly spelled with two "a"s.]  Mr. Vaughan had represented a plaintiff against RIG in an earlier lawsuit and had obtained a default judgment against the company in 2008.  Mr. Vaughan, however, had nothing to do with the publication of the defamatory products actually authored by Faulkner for the benefit of Breitling with the aid of Hallam and Rodriguez.  Faulkner attempted to disguise his true identity but information embedded in the URLs identify him as the actual owner and author.

8.     In addition, on information and belief, Faulkner, aided by Hallam and Rodriguez, faxed false and defamatory fake "wanted" posters for Roberts and his wife Elisa in February 2011 indicating they were from a fictitious entity called "Oil and Gas Fraud Association" but which was really a pseudonym for Faulkner and/or the other individual defendants.  These faxes were sent to Roberts' church and bank and many other recipients who knew Roberts, including out-of-state companies that had done business with plaintiffs.  The fax information was false, defamatory and malicious and sought to defame Roberts and RIG and its business enterprise.  The fax was printed as if it were some form of "wanted" poster and began with "**WANTED**".  The fax read "Oil and Gas Investor Fraud, Timothy and Elisa Roberts, Roberts Investment Group, DBC Operating [another d/b/a of T & E

Investment Group, LLC] (Midlothian, TX)", then contained a picture of Mr. Roberts and his wife and continued with the defamatory statement "Tim and Elisa Roberts have defrauded oil and gas investors out of millions of dollars and paid little to no return". The poster continued: "**REWARD AVAILABLE – STOP THE FRAUD NOW!**"

9.     The information in these facsimile transmissions was wholly false, defamatory, malicious and actionable.

10.     Plaintiffs have suffered actual and special damages as a result of defendants' conduct.

11.     On February 16, 2011, Plaintiffs were hit by a fax attack targeting businesses located in North and South Dallas. This one attack paralyzed Plaintiffs. Plaintiffs received several hundred phone calls. The fax stated that if you wanted to be removed, had any information and wanted a reward to call specific telephone numbers. Each number was either to RIG or directly to Mr. Roberts' personal cell phone. The header of the fax showed the name "Oil and Gas Fraud Association." This site is dedicated to the defaming of RIG.  It is hosted by ENO Inc., a United States of America based company.   False names are given as to the authors of "Nathan Vaughn".  Plaintiffs' forensics company has a report outlining each domain and posting relative to this case.  It was through this tracking that forensics

came across another author as "Donna McCauley."  Research has shown this to be a relative of Christopher Faulkner.  Ms. McCauley passed away in June 2010.

12.     Due to the online negative and defamatory comments, Mr. Roberts has opened a separate "doing business as" known as "Dynamic Energy Partners." There was no way to continue offering marketing or investor packets with the name of "Roberts Investment Group."  In Plaintiffs' business it is very rare that they meet directly with their investors. The large majority is through phone communication. Each investor is able to due to their due diligence by contacting our references and through search on the Internet. The negative postings were taking up the first three (3) pages on the Google search engine.  Plaintiffs hired an "online reputation management" company to defend and post truthful comments on the internet, thus driving down the negative postings to lower pages. We are still engaged in publicizing positive information. (*Supra.*)

13.     The Defendants have continued, after this suit, to forward the Plaintiffs' website to one under which they do business.

## III.   JURISDICTION

Jurisdiction of the Court is invoked pursuant to 28 U.S.C. §§ 1331 and 1338 because this action, in part, is an action for trademark infringement, dilution and cyberpiracy/cybersquatting, brought pursuant to the Lanham Act, 15 U.S.C. §§ 1051, *et seq*. This Court also has jurisdiction over the

Lanham Act claims under 15 U.S.C. § 1121. This Court has jurisdiction over the Texas state law claims under principles of pendent and ancillary jurisdiction and pursuant to 28 U.S.C. §§ 1367.

## IV.   MOTIONS

Defendants' Motion For Summary Judgment [Doc. 126] remains pending.

## V.   CONTENTION OF THE PARTIES

### A.   Plaintiffs' Contentions

1.   This action arises under a federal statute specifically 15 U.S.C. §§ 1051, *et seq.*  This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1338, and under 15 U.S.C. § 1121.  The Court has jurisdiction over the Texas state law claims under principles of pendent and ancillary jurisdiction.

2.   Upon information and belief, each of the individual defendants resides in the Northern District of Texas; all or a substantial part of the events pleaded hereinafter that give rise to the claims stated in this complaint occurred in the Dallas Division of the Northern District of Texas.

3.   RIG is and has been since 2005 in the business of soliciting investments in oil and gas drilling operations by acquiring leases and selling undivided working interests to accredited investors. Parker Hallam ("Hallam") and Dustin Rodriguez ("Rodriguez") are former employees of RIG.

4.     RIG was formed by Timothy Roberts and his wife in Texas in 2005 and since that time has continuously used the trade name "Roberts Investment Group". RIG maintains and uses a logo "R [symbol of drilling rig] G" underneath which is spelled out "Roberts Investment Group". RIG has used this logo and used its trade name on letterhead and other publications and advertisements continuously since 2005. No other person or company in Texas has used said name or logo prior to the use by Plaintiffs.

5.     On or about October 2, 2009, Hallam and Rodriguez quit their employment with RIG. Prior to resigning from RIG, they combined with Christopher Faulkner to form Breitling Oil and Gas Company ("Brietling") on or about September 28, 2009. Breitling is a competitor of RIG in the same general business enterprise. Faulkner, Hallam and Rodriguez are officers and directors of Breitling; their conduct and activities complained of herein were committed for the benefit of Breitling, to gain an unfair competitive advantage to plaintiffs' business.

6.     Sometime prior to June 1, 2010, Faulkner, personally or through his wife, acquired approximately 20 websites using variations of RIG and Timothy Roberts as the domain names. Two of the websites are named "RobertsInvestmentGroupInfo.com" and "TimRobertsOil&Gas.com". Using these internet domain sites, Faulkner acting on behalf of Breitling, and with the assistance and aid of Hallam and Rodriguez, began publishing defamatory, false

and malicious information regarding Roberts and the business enterprise of RIG on the internet.  The URLs were so situated such that if a member of the public used a search engine such as Google or Yahoo to search for the name Roberts, Tim Roberts, Roberts Oil and Gas, or Roberts Investment, the URLs acquired by Faulkner and Breitling would be the first few that would be published by the search engine.  The information contained on the URLs typically began by using the stolen logo of RIG identified hereinabove and indicated, at first blush, that the information being published was from Roberts Investment Group.   The information is false, malicious and defamatory and ends with the following phrase **"DO NOT INVEST WITH ROBERTS INVESTMENT GROUP, TIM ROBERTS OR ELISA ROBERTS.  THEY ARE CROOKS!!!"** and ends at the bottom of the page with the phrase "**INVESTORS BEWARE!!!!!!**".  Other URL publications illegally planted by Faulkner begin with the Roberts Investment Group logo and defame one of its employees, Brad Pratt, and defame the business enterprise of Roberts and his company. They likewise end with "**INVESTORS BEWARE!!!!!!!!!!!!!!!**".  (See Affidavit of Timothy Roberts attached hereto as **Exhibit A**, and incorporated herein as if set forth in verbatim.)

7.     Faulkner attempted to disguise the author of the information on some of these pirated URLs by identifying the author as "Nathan Vaughn", a lawyer in the State of Ohio.  [Mr. Vaughan's name is correctly spelled with two "a"s.]  Mr.

Vaughan had represented a plaintiff against RIG in an earlier lawsuit and had obtained a default judgment against the company in 2008.  Mr. Vaughan, however, had nothing to do with the publication of the defamatory products actually authored by Faulkner for the benefit of Breitling with the aid of Hallam and Rodriguez.  Faulkner attempted to disguise his true identity but information embedded in the URLs identify him as the actual owner and author.

8.     In addition, on information and belief, Faulkner, aided by Hallam and Rodriguez, faxed false and defamatory fake "wanted" posters for Roberts and his wife Elisa in February 2011 indicating they were from a fictitious entity called "Oil and Gas Fraud Association" but which was really a pseudonym for Faulkner and/or the other individual defendants.  These faxes were sent to Roberts' church and bank and many other recipients who knew Roberts, including out-of-state companies that had done business with plaintiffs.  The fax information was false, defamatory and malicious and sought to defame Roberts and RIG and its business enterprise.  The fax was printed as if it were some form of "wanted" poster and began with "**WANTED**".  The fax read "Oil and Gas Investor Fraud, Timothy and Elisa Roberts, Roberts Investment Group, DBC Operating [another d/b/a of T & E Investment Group, LLC] (Midlothian, TX)", then contained a picture of Mr. Roberts and his wife and continued with the defamatory statement "Tim and Elisa Roberts have defrauded oil and gas investors out of millions of dollars and paid

little to no return".  The poster continued:  "**REWARD AVAILABLE – STOP THE FRAUD NOW!**"

9.    The information in these facsimile transmissions was wholly false, defamatory, malicious and actionable.

10.    Plaintiffs have suffered actual and special damages as a result of defendants' conduct.

11.    On February 16, 2011, Plaintiffs were hit by a fax attack targeting businesses located in North and South Dallas. This one attack paralyzed Plaintiffs. Plaintiffs received several hundred phone calls. The fax stated that if you wanted to be removed, had any information and wanted a reward to call specific telephone numbers. Each number was either to RIG or directly to Mr. Roberts' personal cell phone. The header of the fax showed the name "Oil and Gas Fraud Association." This site is dedicated to the defaming of RIG.  It is hosted by ENO Inc., a United States of America based company.    False names are given as to the authors of "Nathan Vaughn".   Plaintiffs' forensics company has a report outlining each domain and posting relative to this case.  It was through this tracking that forensics came across another author as "Donna McCauley."  Research has shown this to be a relative of Christopher Faulkner.  Ms. McCauley passed away in June 2010.

12.    Due to the online negative and defamatory comments, Mr. Roberts has opened a separate "doing business as" known as "Dynamic Energy Partners."

There was no way to continue offering marketing or investor packets with the name of "Roberts Investment Group."  In Plaintiffs' business it is very rare that they meet directly with their investors. The large majority is through phone communication. Each investor is able to due to their due diligence by contacting our references and through search on the Internet. The negative postings were taking up the first three (3) pages on the Google search engine.  Plaintiffs hired an "online reputation management" company to defend and post truthful comments on the internet, thus driving down the negative postings to lower pages. We are still engaged in publicizing positive information. (*Supra.*)

13.    The Defendants have continued, after this suit, to forward the Plaintiffs' website to one under which they do business.

### B.    Defendants' Contentions

Defendants assert that Plaintiffs' contentions herein extend beyond their Original Complaint and object to any contentions contained herein that extend beyond Plaintiffs' Original Complaint (specifically contained in Plaintiffs' Statement of the Case §II(A), ¶ 11-13; Plaintiffs' Contentions §V(A), ¶ 11-13; Plaintiffs' Contested Issues of Fact §VII(A), ¶ 9-11; Plaintiffs' Contested Propositions of Law §IX(A), ¶ 17-19 & 29 (False Advertising), ¶ 36-37 (tortious interference), ¶ 39 (conspiracy), ¶ 40 (alter ego)).  Defendants deny the alleged conduct attributed to them by Plaintiffs. Defendants assert that Plaintiffs have

suffered no damages.  Defendants object to Plaintiffs presenting any evidence of damages at trial because Plaintiffs have failed to disclose an amount of damages or the method of calculating Plaintiffs' alleged damages.  Defendants also assert the following defenses to Plaintiffs' claims: failure to state a claim upon which relief may be requested, Federal preemption, substantial truth, qualified privilege, good faith, consent, legal justification, estoppel, Plaintiffs' fraud, Plaintiffs' fault, fair use and nominative fair use, Plaintiffs' alleged marks constitute a common descriptive and/or generic combination of words that have not acquired a secondary meaning, equitable estoppel, laches, unclean hands, failure to mitigate, Plaintiffs' claims were caused by third-parties over whom Defendants have no control, duty or obligation to police, waiver, Plaintiffs' marks, trade name and trade dress fail to meet the registration requirements under Federal Trademark law, Free Speech as guaranteed by the First Amendment to the United States Constitution, public concern, Plaintiffs are public figures or limited purpose public figures, parody, Plaintiffs use their marks, trade name and trade dress in an overall effort to mislead their customers about their products and services, non-commercial use of a mark, news reporting and commentary, and Plaintiffs' alleged mark, trade name and trade dress are generic.

## VI.   ADMISSIONS OF FACT

### A.   Plaintiffs' Admissions of Fact

The parties have conferred but were unable to reach an agreement on the agreed facts and agreed principles of law.  The parties are continuing to work together to reach an agreement and will file an Amended Joint Pretrial Order once such an agreement is reached in order to narrow the contested points.

### B.   Defendants' Admissions of Fact

1. Faulkner is an individual who resides in the Northern District of Texas.

2. Breitling Oil and Gas Corporation organized under the laws of the State of Texas.

3. Hallum is an individual who resides in the Northern District of Texas.

4. Rodriguez is an individual who resides in the Northern District of Texas.

5. Hallum and Rodriquez ceased to work for T & E Investment Group, LLC d/b/a Roberts Investment Group ("Roberts Investment Group") in or around the Fall of 2009.

## VII.  CONTESTED ISSUES OF FACT

### A.    Plaintiffs' Contested Issues of Fact

1.    RIG is and has been since 2005 in the business of soliciting investments in oil and gas drilling operations by acquiring leases and selling undivided working interests to accredited investors. Parker Hallam ("Hallam") and Dustin Rodriguez ("Rodriguez") are former employees of RIG.

2.    RIG was formed by Timothy Roberts and his wife in Texas in 2005 and since that time has continuously used the trade name "Roberts Investment Group".  RIG maintains and uses a logo "R [symbol of drilling rig] G" underneath which is spelled out "Roberts Investment Group".  RIG has used this logo and used its trade name on letterhead and other publications and advertisements continuously since 2005.  No other person or company in Texas has used said name or logo prior to the use by Plaintiffs.

3.    On or about October 2, 2009, Hallam and Rodriguez quit their employment with RIG.  Prior to resigning from RIG, they combined with Christopher Faulkner to form Breitling Oil and Gas Company ("Brietling") on or about September 28, 2009.  Breitling is a competitor of RIG in the same general business enterprise.  Faulkner, Hallam and Rodriguez are officers and directors of Breitling; their conduct and activities complained of herein were committed for the benefit of Breitling, to gain an unfair competitive advantage to plaintiffs' business.

4.      Sometime prior to June 1, 2010, Faulkner, personally or through his wife, acquired approximately 20 websites using variations of RIG and Timothy Roberts as the domain names.   Two of the websites are named "RobertsInvestmentGroupInfo.com" and "TimRobertsOil&Gas.com".  Using these internet domain sites, Faulkner acting on behalf of Breitling, and with the assistance and aid of Hallam and Rodriguez, began publishing defamatory, false and malicious information regarding Roberts and the business enterprise of RIG on the internet.  The URLs were so situated such that if a member of the public used a search engine such as Google or Yahoo to search for the name Roberts, Tim Roberts, Roberts Oil and Gas, or Roberts Investment, the URLs acquired by Faulkner and Breitling would be the first few that would be published by the search engine.  The information contained on the URLs typically began by using the stolen logo of RIG identified hereinabove and indicated, at first blush, that the information being published was from Roberts Investment Group.   The information is false, malicious and defamatory and ends with the following phrase **"DO NOT INVEST WITH ROBERTS INVESTMENT GROUP, TIM ROBERTS OR ELISA ROBERTS.  THEY ARE CROOKS!!!"** and ends at the bottom of the page with the phrase **"INVESTORS BEWARE!!!!!!"**.  Other URL publications illegally planted by Faulkner begin with the Roberts Investment Group logo and defame one of its employees, Brad Pratt, and defame the business

enterprise of Roberts and his company. They likewise end with "**INVESTORS BEWARE!!!!!!!!!!!!!!!!!!**". (See Affidavit of Timothy Roberts attached hereto as **Exhibit A**, and incorporated herein as if set forth in verbatim.)

5.     Faulkner attempted to disguise the author of the information on some of these pirated URLs by identifying the author as "Nathan Vaughn", a lawyer in the State of Ohio. [Mr. Vaughan's name is correctly spelled with two "a"s.] Mr. Vaughan had represented a plaintiff against RIG in an earlier lawsuit and had obtained a default judgment against the company in 2008. Mr. Vaughan, however, had nothing to do with the publication of the defamatory products actually authored by Faulkner for the benefit of Breitling with the aid of Hallam and Rodriguez. Faulkner attempted to disguise his true identity but information embedded in the URLs identify him as the actual owner and author.

6.     In addition, on information and belief, Faulkner, aided by Hallam and Rodriguez, faxed false and defamatory fake "wanted" posters for Roberts and his wife Elisa in February 2011 indicating they were from a fictitious entity called "Oil and Gas Fraud Association" but which was really a pseudonym for Faulkner and/or the other individual defendants. These faxes were sent to Roberts' church and bank and many other recipients who knew Roberts, including out-of-state companies that had done business with plaintiffs. The fax information was false, defamatory and malicious and sought to defame Roberts and RIG and its business

enterprise.  The fax was printed as if it were some form of "wanted" poster and began with "**WANTED**".  The fax read "Oil and Gas Investor Fraud, Timothy and Elisa Roberts, Roberts Investment Group, DBC Operating [another d/b/a of T & E Investment Group, LLC] (Midlothian, TX)", then contained a picture of Mr. Roberts and his wife and continued with the defamatory statement "Tim and Elisa Roberts have defrauded oil and gas investors out of millions of dollars and paid little to no return".  The poster continued:  "**REWARD AVAILABLE – STOP THE FRAUD NOW!**"

7.     The information in these facsimile transmissions was wholly false, defamatory, malicious and actionable.

8.     Plaintiffs have suffered actual and special damages as a result of defendants' conduct.

9.     On February 16, 2011, Plaintiffs were hit by a fax attack targeting businesses located in North and South Dallas. This one attack paralyzed Plaintiffs. Plaintiffs received several hundred phone calls. The fax stated that if you wanted to be removed, had any information and wanted a reward to call specific telephone numbers. Each number was either to RIG or directly to Mr. Roberts' personal cell phone. The header of the fax showed the name "Oil and Gas Fraud Association." This site is dedicated to the defaming of RIG.  It is hosted by ENO Inc., a United States of America based company.   False names are given as to the authors of

"Nathan Vaughn".   Plaintiffs' forensics company has a report outlining each domain and posting relative to this case.  It was through this tracking that forensics came across another author as "Donna McCauley."  Research has shown this to be a relative of Christopher Faulkner.  Ms. McCauley passed away in June 2010.

10.   Due to the online negative and defamatory comments, Mr. Roberts has opened a separate "doing business as" known as "Dynamic Energy Partners." There was no way to continue offering marketing or investor packets with the name of "Roberts Investment Group."   In Plaintiffs' business it is very rare that they meet directly with their investors. The large majority is through phone communication. Each investor is able to due to their due diligence by contacting our references and through search on the Internet. The negative postings were taking up the first three (3) pages on the Google search engine.  Plaintiffs hired an "online reputation management" company to defend and post truthful comments on the internet, thus driving down the negative postings to lower pages. We are still engaged in publicizing positive information. (*Supra.*)

11.   The Defendants have continued, after this suit, to forward the Plaintiffs' website to one under which they do business.

###   B.   Defendants' Contested Issues of Fact

1.   Whether the alleged defamatory statements are true.

2.   Whether Plaintiffs' consented to the publication of the alleged

defamatory statements.

3.      Whether the alleged defamatory statements were legally justified.

4.      Whether Plaintiffs are estopped to deny the truth of the alleged defamatory statements.

5.      Whether Plaintiffs have committed fraud.

6.      Whether any of the alleged claims are the result of Plaintiffs' fault.

7.      Whether the alleged use of Plaintiffs' marks, trade name or trade dress was a fair use or nominative fair use.

8.      Whether Plaintiffs' marks, trade name or trade dress are merely descriptive or generic.

9.      Whether Plaintiffs' marks, trade name or trade dress have acquired a secondary meaning unique to Plaintiffs.

10.     Whether Plaintiffs are equitably estopped to deny the truth of the alleged defamatory statements.

11.     Whether Plaintiffs delayed too long in asserting their claims.

12.     Whether Plaintiffs have unclean hands.

13.     Whether Plaintiffs failed to mitigate their alleged damages.

14.     Whether the conduct complained of was caused by third-parties over whom Defendants have no control or duty/obligation to police.

15.      Whether Plaintiffs waived any of their claims.

16.     Whether Plaintiffs have suffered any damages.

17.     Whether Plaintiffs disclosed any damages.

18.     Whether Plaintiffs' marks, trade name or trade dress meet the registration requirements under Federal trademark law.

19.     Whether the First Amendment to the United States Constitution protects the speech complained of.

20.     Whether the alleged defamatory statements constitute matters of public concern.

21.     Whether Plaintiffs are public figures or limited purpose public figures.

22.     Whether the alleged defamatory statements complained of constitute parody.

23.     Whether Plaintiffs use their marks, trade name or trade dress in an overall effort to mislead their customers about their products and services.

24.     Whether the alleged use of Plaintiffs' marks, trade name or trade dress constitutes fair use or nominative fair use.

25.     Whether the alleged defamatory statements constitute news reporting or commentary.

26.     Whether Plaintiffs' contentions as contained in the Joint Pretrial Order exceed and add to Plaintiffs' contentions contained in Plaintiffs' Original Complaint.

## VIII.  AGREED APPLICABLE PROPOSITIONS OF LAW

The parties have conferred but were unable to reach an agreement on the agreed facts and agreed principles of law. The parties are continuing to work together to reach an agreement and will file an Amended Joint Pretrial Order once such an agreement is reached in order to narrow the contested points.

## IX.  CONTESTED PROPOSITIONS OF LAW

### A.  Plaintiffs' Contested Propositions of Law

1.  A trademark need not be registered to be protected by the Lanham Act. *See Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992).

2.  An unregistered trademark is protectable if it is (1) inherently distinctive or (2) has acquired distinctiveness through secondary meaning. *Security Center, Ltd. v. First National Security Centers*, 750 F.2d 1295, 1298 (5th Cir. 1985).

3.  A trademark is inherently distinctive if its intrinsic nature serves to identify a particular source of a product, thereby entitling the mark to a high degree of trademark protection. *Osgood Heating & Air Conditioning Inc. v. Osgood*, 2004 WL 3436800 (W.D. Tex Dec. 21, 2004).

4.  Arbitrary marks consist of words that are a part of everyday language but which are arbitrarily applied to a particular good or service. *Pebble Beach Co. v. Tour 18 I, Ltd.*, 942 F. Supp. 1513, 1537 n.19 (S.D. Tex.

1996), *aff'd as modified*, 155 F.3d 526 (5th Cir. 1998). Arbitrary terms require no proof of secondary meaning in order to be protected because they are considered inherently distinctive. *Two Pesos Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992); *Sunbeam Prods. Inc. v. West Bend Co.*, 123 F.3d 246, 252 (5th Cir. 1997); *Pebble Beach Co. v. Tour 18 I, Ltd.*, 942 F. Supp. 1513, 1537 (S.D. Tex. 1996), *aff'd as modified*, 155 F.3d 526 (5th Cir. 1998).

5.    Two generic words combined may obtain protectible trademark status if the combination is descriptive, suggestive, arbitrary, or fanciful. *Texas Pig Stands, Inc. v. Hard Rock Café Int'l, Inc.*, 951 F.2d 684, 692 (5th Cir. 1992); *see also Service Merchandise v. Service Jewelry Stores, Inc.*, 737 F. Supp. 983, 999 (S.D. Tex. 1990).

6.    Like suggestive and arbitrary terms, fanciful terms are inherently distinctive and require no proof of secondary meaning in order to be protected. *Two Pesos Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992); *Sunbeam Prods. Inc. v. West Bend Co.*, 123 F.3d 246, 252 (5th Cir. 1997); *Union Nat'l Bank of Texas, Laredo v. Union Nat'l Bank of Texas, Austin*, 909 F.2d 839, 844 (5th Cir. 1990); *Pebble Beach Co. v. Tour 18 I, Ltd.*, 942 F. Supp. 1513, 1537 (S.D. Tex. 1996), *aff'd as modified*, 155 F.3d 526 (5th Cir. 1998).

7.    Secondary meaning is achieved "when, in the minds of the

public, the primary significance of a product feature or term is to identify the source of the product rather than the product itself." *Sugar Busters L.L.C. v. Brennan*, 177 F.3d 258, 268 (5th Cir. 1999).

8.     To prove trademark infringement and unfair competition under the Lanham Act, a plaintiff must show that the use of the mark is "likely to cause confusion among consumers as to the source, affiliation, or sponsorship" of the goods or services. *Scott Fetzer Co. v. House of Vacuums Inc.*, 381 F.3d 477, 483 (5th Cir. 2004) (citing 15 U.S.C. § 1125(a)); *Security Center*, 705 F.2d at 1298.

9.     The likelihood of confusion standard also applies to claims for trademark infringement and unfair competition under Texas law. *Scott Fetzer*, 381 F.3d at 484; *see also Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 258 (5th Cir. 1980).

10.     In determining whether a likelihood of confusion exists, the following nonexhaustive list of factors are considered: (1) the type of mark allegedly infringed; (2) the similarity between the two marks; (3) the similarity of the products or services; (4) the identity of the retail outlets and purchasers; (5) the identity of the advertising media used; (6) the defendant's intent; and (7) any evidence of actual confusion. *Westchester Media v. PRL USA Holdings, Inc.*, 214 F.3d 658, 664 (5th Cir. 2000); *Elvis Presley Enters., Inc. v. Capece*, 141 F.3d

188, 194 (5th Cir. 1998). "No one factor is dispositive, and a finding of a likelihood of confusion does not even require a positive finding on a majority of these 'digits of confusion.'" *Conan Props., Inc. v. Conans Pizza, Inc.*, 752 F.2d 145, 150 (5th Cir. 1985).

11.    Stronger, more distinctive trademarks receive greater protection due to the likelihood that consumers will confuse the junior user's mark with that of the senior user. *Elvis Presley Enters.*, 141 F.3d at 201; *Amstar Corp.*, 615 F.2d at 259.

12.    Similarity of the marks, "is determined by comparing the marks' appearance, sound, and meaning." *Elvis Presley Enters.*, 141 F.3d at 201.

13.    "The greater the similarity between products and services, the greater the likelihood of confusion." *Westchester Media*, 214 F.3d at 666 (quoting *Exxon Corp.*, 628 F.2d at 505).

14.    In determining whether there is an identity of retail outlets and purchasers, courts look at whether there is a "considerable overlap" between the purchasers of the competing products or services. *See, e.g., Moore Bus. Forms*, 960 F.2d at 490; *Sun Banks*, 651 F.2d at 318 (the identity of customers is largely the result of offering comparable services).

15.    "The greater the similarity in the [advertising] campaigns, the greater the likelihood of confusion." *Exxon Corp.*, 628 F.2d at 506.

16.     Proof of an intent to confuse the public "is not necessary to finding a likelihood of confusion." *Elvis Presley Enters.*, 141 F.3d at 203.

17.     To establish false advertising under the Lanham Act A plaintiff must show the following:

> (1) that the defendant made a false statement of fact about its product in a commercial advertisement; (2) that the statement actually deceived or has a tendency to deceive a substantial segment of its audience; (3) the deception is likely to influence the purchasing decision; (4) the defendant caused the false statement to enter interstate commerce; and (5) the plaintiff[ ] ha[s] been or [is] likely to be injured as a result.

*Logan v. Burgers Ozark Country Cured Hams, Inc.*, 263 F.3d 447, 462 (5th Cir. 2001) (alterations in original); *see also King v. Ames*, 179 F.3d 370, 373-74 (5th Cir.1999).

18.     In order for a representation to constitute "commercial" advertising or promotion, it must be commercial speech made by competitor for the purpose of influencing consumers to buy defendant's goods or services. *Seven-Up Co. v. Coca-Cola Co.*, 86 F.3d 1379, 1384 (5th Cir. 1996).

19.     If the statement or representation is shown to be literally false, rather than simply misleading, "the court must assume that it actually misled consumers, without requiring any evidence of such deception from the plaintiff." *IQ Prods. Co. v. Pennzoil Prods. Co.*, 305 F.3d 368, 375 (5th Cir. 2002) (citing *Pizza Hut, Inc. v. Papa John's Int'l, Inc.*, 227 F.3d 489, 497

(5th Cir. 2000)).

20.      "Trademark dilution is the weakening of the ability of a mark to clearly and unmistakably distinguish the source of a product." *Scott Fetzer*, 381 F.3d at 489 (citing 15 U.S.C. § 1127). The Federal Trademark Dilution Act ("FTDA") proscribes the commercial use in commerce of a mark or trade name "if such use begins after the mark has become famous and causes dilution of the distinctive quality of the mark." 15 U.S.C. § 1125(c)(1). In contrast, the Texas Anti-dilution Statute "explicitly requires only distinctiveness, not fame." *Advantage Rent-A-Car, Inc. v. Enterprise Rent- A-Car, Co.*, 238 F.3d 378, 381 (5th Cir. 2001); *see* Tex. Bus. & Com. Code § 16.29 ("A person may . . . enjoin an act likely to . . . dilute the distinctive quality of a mark."). While the Texas statute incorporates a "likelihood of dilution" standard, the FTDA requires a showing of actual harm. *Westchester Media*, 214 F.3d at 670-71. By meeting the FTDA standards, a plaintiff proves more than is required under Texas law.

21.      Dilution can occur through the blurring or tarnishing of a mark. *Scott Fetzer*, 381 F.3d at 489 (citing *Westchester Media*, 214 F.3d at 670 n.12). Blurring "involves a diminution in the uniqueness or individuality of a mark because of its use on unrelated goods." *Id.* Tarnishing, in contrast, "results when one party uses another's mark in a manner that tarnishes or appropriates the goodwill and reputation associated with the mark."

*Westchester Media*, 214 F.3d at 670 n.12.

22.    If a manufacturer or distributor intentionally induces another to infringe a trademark, or if it continues to supply its product to one whom it knows or has reason to know is engaging in trademark infringement, the manufacturer or distributor is contributorally responsible for any harm done as a result of the deceit. *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844, 853-54, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982). A finding of contributory infringement is dependent upon the existence of direct infringement. *Novell, Inc. v. CPR Distributing Inc.*, et al, 2000 U.S. Dist. 9975, at *27 (S.D .Tex. May 4, 2000) (quoting *Joy Technologies, Inc., v. Flakt, Inc.*, 6 F.3d 770, 774 (Fed.Cir.1993)).

23.    In addition, one may be held vicariously liable for an infringing activity if he has the right and ability to supervise the activity and also has a direct financial interest in it. *Gershwin Publishing Corp. v. Columbia Artists Mgmt.*, Inc., 443 F.2d 1159, 1161 2nd Cir. 1971); *see also Choice Hotels, Intern., Inc. v. Westhill Hotels I Limited*, 1996 WL 706876, at *3 (N.D. Tex. Dec. 4, 1996); *Taylor Made Golf Co. v. MJT Consulting Group, LLC*, 265 F. Supp. 2d 732, 746 (N.D. Tex. 2003) ("a corporate officer who directs, controls, ratifies, participates in, or is the moving force behind the infringing activity, is personally liable for such infringement without regard to piercing the corporate veil.").

24.     Under the Anti-Cybersquatting Consumer Protection Act ("ACPA"), the owner of a mark can recover against a person who, acting with "a bad faith intent to profit from that mark . . . registers, traffics in, or uses a domain name that . . . is identical or confusingly similar to that mark." 15 U.S.C. § 1125(d)(1)(A).

25.     Where the defendant was aware of the existing trademark, "a presumption of bad faith arises from the choice of the [senior user's] name because it is inferable that the junior user adopted the mark for the purpose of profiting from the aura of goodwill surrounding the senior user's mark." *Pet Silk, Inc. v. Jackson*, 481 F. Supp. 2d 824, 833 (S.D. Tex. 2007) (alteration in original) (quoting *E & J Gallo Winery v. Spider Webs Ltd.*, 286 F.3d 270, 277 (5th Cir. 2002).

26.     In determining whether a person has bad faith intent described under subparagraph (a), a court may consider factors such as, but not limited to:

(I)     the trademark or other intellectual property rights of the person, if any, in the domain name;

(II)    the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;

(III)   the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;

(IV)    the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;

(V)     the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that

could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;

(VI)    the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;

(VII)   the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;

(VIII)  the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and

(IX)    the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous without the meaning of subsection (c) of this section.

15 U.S.C. § 1125(d)(1)(B)(i); *See also Pet Silk*, 481 F. Supp. 2d at 832-33 (applying factors upon motion for injunctive relief based on the likelihood of success on ACPA claims); *March Madness Athletic Ass'n, L.L.C. v. Netfire, Inc.*, 310 F. Supp. 2d 786, 814-15 (N.D. Tex 2003 (applying factors after bench trial on ACPA claims), *aff'd*, 120 Fed. Appx. 540 (5th Cir. 2005); *E & J Gallo Winery v. Spider Webs Ltd.*, 129 F. Supp. 2d 1033, 1045-46 (S.D. Tex. 2001 (applying factors upon motion for summary judgment on ACPA claims), *aff'd*, 286 F.3d 270 (5th Cir. 2002).

27.     A defendant who acts even partially in bad faith in registering a domain name is not, as a matter of law, entitled to benefit from the Act's safe harbor provision. *Virtual Works, Inc. v. Volkswagon of Am., Inc.*, 238 F.3d 264, 270 (4th Cir. 2001) (emphasizing that virtually every defendant could make some colorable argument that they are entitled the safe harbor and recognizing in that case that the defendant's "openly admitted hope of profiting from consumer confusion of vw.net with the VW mark disqualifie[d] Virtual Works from the ACPA's safe harbor.").

28.     "[D]omain names that are substantially the same as a trademark are confusingly similar and create a presumption of confusion." *E & J Gallo*, 129 F. Supp. 2d at 1043 (citing *People for the Ethical Treatment of Animals, Inc. v. Doughney*, 113 F. Supp. 2d 915, 920 (E.D. Va. 2000; *Shields v. Zuccarini*, 89 F. Supp. 2d 634, 639 (E.D. Pa. 2000); *OBH, Inc. v. Spotlight Magazine, Inc.*, 86 F. Supp. 2d 176, 188 (W.D.N.Y. 2000).

29.     When a violation of Section 43(a) (false advertising and designation), 43(d) (cyberpiracy/cybersquatting) or a willful violation of 43(c) (dilution) of the Lanham Act occurs, the plaintiff is entitled to recover its actual damages and/or the defendant's profits.  15 U.S.C. § 1117(a).

30.     In assessing an infringer's profits for trademark infringement, the Lanham Act expressly provides that "the plaintiff shall be required to prove

defendant's sales only; defendant must prove all elements of cost or deduction claimed." 15 U.S.C. § 1117(a). In other words, once a plaintiff proves a defendant's gross sales, "the defendant bears the burden of demonstrating which of its total sales are *not* attributable to the infringing activity as well as any deductions for its overhead." 3 Jerome Gilson, Trademark Protection and Practice § 14.03[6][d] (2003) (citing 15 U.S.C. § 1117(a)); *see also Texas Tech. Univ. v. Spiegelberg*, 461 F.Supp.2d 510, 526 (N.D. Tex. 2006) ("According to the plain meaning of the Act, the plaintiff is entitled to the full amount of the defendant's gross sales where the defendant has not produced any evidence of deductions."); *Wynn Oil, Co. v. American Way Service Corp.*, 943 F..2d 595, 606 (6th Cir. 1991) ("[B]oth common sense and the statute suggest that the burden of apportioning profits  should be placed on defendants.").

31.    The Fifth Circuit has repeatedly held that proof of actual confusion is not required in order to obtain an award of defendant's profits. *See Quick Tech., Inc. v. The Sage Group PLC*, 313 F.3d 338, 348 (5th Cir. 2002) (citing *Maltina Corp. v. Cawy Bottling Co., Inc.*, 613 F.2d 582, 585 (5th Cir. 1980) ("an accounting is proper even if the defendant and plaintiff are not in direct competition, and the defendants' infringement has not diverted sales from the plaintiff")); *see also Boston Professional Hockey Assoc., Inc. v. Dallas Cap & Emblem Manufacturing, Inc.*, 597 F.2d 71, 75 (5th Cir. 1979)

(upholding award of actual damages and defendant's profits without quantifiable proof of lost sales because mere misappropriation of trademark deprived plaintiff of the economic benefits associated with plaintiff's property rights in the mark).

32. "The burden is the infringer's to prove that [their] infringement had no cash value in sales made by [them]." *Mishawaka Rubber & Woolen Manufacturing Co. v. S.S. Kresge Co.*, 316 U.S. 203, 206-207 (1942); *see also* S*ystem Forward America, Inc., v. Martinez d/b/a Pop-A-Car-Open*, 129 Fed.Appx. 88, 89, 2005 U.S. App. LEXIS 6527 at 3 (5th Cir. 2005) (citing *Mishawaka*, the Fifth Circuit explained that the defendant "bore the burden of proving that his infringement did not result in his financial benefit.").

33. "There may well be a windfall to the trade-mark owner where it is impossible to isolate the profits which are attributable to the use of the infringing mark. But to hold otherwise would give the windfall to the wrongdoer. In the absence of his proving the contrary, it promotes honesty and comports with experience to assume that the wrongdoer who makes profits from the sales of goods bearing a mark belonging to another was enabled to do so because he was drawing upon the good will generated by that mark." *Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co.*, 316 U.S. 203, 207 (1942); *accord System Forward America Inc. v. Martinez*, 129

Fed.Appx. 88, 89, 2005 U.S. App. LEXIS 6527 at 3 (5th Cir. 2005) (not selected for publication in the Federal Reporter).

34.    A case is exceptional if the defendant acted willfully, maliciously, fraudulently, or deliberately. *Pebble Beach Co. v. Tour 18 I Ltd.*, 942 F. Supp. 1513, 1571-72 (S.D. Tex. 1996), *aff'd as modified*, 155 F.3d 526 (5th Cir. 1998); *Buca di Bacco, Inc. v. Buca di Bacc', Inc.*, 828 F. Supp. 31, 32 (S.D. Tex. 1993).

35.    Where a defendant's acts of infringement are deliberate and intentional and designed to prey on a competitor's goodwill and customers, a finding that such a case is exceptional under the Lanham Act and an award of attorneys' fees is both warranted and justified. *See, e.g., Delilah Media Group, L.P. v. V.L. Raymer a/k/a Virginia Comito*, 2005 U.S. Dist. LEXIS 13253 (N.D. Tex. June 30, 2005) (holding that bad faith registration of domain name with intent to profit from the good will of trademark owner supported finding of exceptional case and award of attorneys' fees); *Pebble Beach Co. v. Tour 18 I, Ltd.*, 942 F. Supp. 1513 (S.D. Tex. 1996) (explaining that while deliberate copying does not *per se* establish that a case is exceptional, the Court acknowledged that preying conduct, particularly when combined with deliberate behavior supports a finding of exceptionality).

36.    To prove tortious interference with existing business relations, a

plaintiff must prove each of the following by a preponderance of the evidence: (1) plaintiff had a valid contract; (2) defendant willfully and intentionally interfered with the contract; (3) the interference proximately caused injury to plaintiff; and (4) plaintiff incurred actual damage or loss. *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 207 (Tex. 2002); *Prudential Insurance Co. of America v. Financial Review Servs. Inc.*, 29 S.W.3d 74, 77 (Tex. 2000).

37.    To prove tortious interference with prospective business relations, a plaintiff must prove each of the following by a preponderance of the evidence: (1) there was a reasonable probability that the plaintiff would have entered into a business relationship with a third person; (2) the defendant intentionally interfered with the relationship; (3) the defendant's conduct was independently tortious or unlawful (a finding of infringement of T&E's marks   constitutes independent or unlawful conduct); (4)  the interference proximately caused plaintiff's injury; and (5) plaintiff suffered actual damage or loss. *Wal-Mart Stores v. Sturges*, 52 S.W.3d 711, 726 (Tex. 2001) (noting that independently tortious merely means that conduct would be actionable under a recognized tort).

38.    "Common law trademark infringement action under Texas law presents no difference in issues than those under federal trademark infringement actions." *Zapata Corp. v. Zapata Trading Int'l, Inc.*, 814 S.W.2d

45, 47 (Tex.App.—Houston [14th Dist.] 1992, no writ).

39.     A civil conspiracy is a combination by two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means. *Firestone Steel Products Co. v. Barajas*, 927 S.W.2d 608, 614 (Tex. 1996).

40.     To prove that the corporate defendants are merely an alter ego of the individual defendants, and therefore personally liable for the asserted wrongdoing, a plaintiff must prove each of the following by a preponderance of the evidence: (1) there must be such unity between the corporate and the individual that the separateness of the corporate had ceased and holding the corporation responsible alone would result in injustice; and (2) the individual caused the corporation to be used for the purpose of perpetuating and did perpetuate an actual fraud on the plaintiff primarily for the direct personal benefit of the individual. *Castleberry v. Branscum*, 721 S.W.2d 270, 272 & n.3 (Tex. 1986).

41.     In order to maintain a cause of action for defamation, a plaintiff must prove the following by a preponderance of the evidence: (1) the defendant published a statement; (2) that was defamatory toward the plaintiff; and (3) while acting with negligence regarding the truth of the statement. *WFAA-TV*

*v. McLemore*, 978 S.W.2d 568, 571 (Tex. 1998). To prove an action for defamation, a statement must be published and that statement must be false, a statement incapable of being proved true or false

cannot be the basis of a defamation action. *Harvest House Publ'rs v. Local Church*, 190 S.W.3d 204, 211-12 (Tex.App.—Houston [1st Dist.] 2006, pet. ref'd).

42.     Ceasing the infringing and diluting activity does not allow a defendant to escape liability for its infringement. *Elvis Presley Enters. Inc. v. Capece*, 141 F.3d 188, 198 (5th Cir. 1998).

43.     "In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount. If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case. Such sum in either of the above circumstances shall constitute compensation and not a penalty."   15 U.S.C. § 1117(a).

44.     For a violation of 15 U.S.C. § 1125(d)(1), at any time before final judgment is rendered by the trial court, a plaintiff may elect to recover,

instead of actual damages and profits, an award of statutory damages in the amount of not less than $1,000.00 and not more than $100,000.00 per domain name, as the court considers just.  15 U.S.C. § 1117(d).

45.    The Court also has the inherent power to impose sanctions, including attorneys' fees, "when a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45-46 (1991).

46.    Spoliation is "the destruction or significant alteration of evidence, *or the failure to preserve property* for another's use as evidence in pending or reasonably foreseeable litigation." *Union Pacific R. Co. v. Heartland Barge Management, L.L.C.*, 2006 WL 2850064, at *15 (S.D. Tex. Oct. 03, 2006) (citing *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999)) (emphasis added); see also *Consolidated Aluminum Corp. v. Alcoa, Inc.*, 244 F.R.D. 335, 339 (M.D. La. 2006); *Zubulake v. UBS Warburg*, LLC, 220 F.R.D. 212, 216 (S.D.N.Y. 2003) (discussing spoliation).

47.    The duty to preserve documents "arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation." *Consolidated Aluminum Corp.*, 244 F.R.D. at 339 (citing *Zubulake*, 220 F.R.D. at 216). "The duty to preserve extends to any documents or tangible things made by

individuals 'likely to have discoverable information that the disclosing party may use to support its claims or defenses.'" *Id.*

48.     Destruction of documents related to potential litigation is subject to sanction. *See Bayoil, S.A. v. Polembros Shipping, Ltd.*, 196 F.R.D. 479, 482 (S.D. Tex. 2000). Because the destruction or alteration of evidence is not addressed under RULE 37, the court must rely on its inherent powers to impose sanctions. *See Toon v. Wackenhut Corrections Corp.*, 250 F.3d 950, 952 (5th Cir. 2001); *see also Duque v. Werner Enterprises, Inc.*, 2007 WL 998156, *6 (S.D. Tex. 2007) (noting that because the alteration of evidence is not addressed under RULE 37, the court used its inherent power to impose sanctions). Additionally, in the Fifth Circuit a spoliation jury instruction for an adverse inference as to the destroyed evidence "is predicated on the bad conduct of the defendant." *Vick v. Tex. Employment Comm'n*, 514 F.2d 734, 737 (5th Cir. 1975).

49.     Courts may "assume facts against a party that destroys or loses evidence," and thus may infer that the destroyed evidence "weakened the[ir] case and that" the "destruction . . . was intentional." *F.D.I.C. v. Hurwitz*, 384 F. Supp. 2d 1039, 1099-1100 (S.D. Tex. 2005); *see also Smith v. Am. Founders Fin., Corp.*, 365 B.R. 647, 681 (Bankr. S.D. Tex. 2007) ("A court may also assume facts against a party that destroys or loses evidence subject to a

preservation obligation."). Consequently, destruction of evidence *after a lawsuit is filed* that a party is under a duty to preserve—even if that party does not legally "own" such evidence—is itself evidence that the party responsible for the destroyed data has engaged in "bad conduct."

50. The destruction of a plaintiff's "best evidence" by the defendant "inflict[s] the ultimate prejudice upon plaintiffs." *Arista Records, L.L.C. v. Tschirhart*, 241 F.R.D. 462, 465 (W.D. Tex. 2006) (awarding a default judgment against a defendant because an adverse inference instruction was not a sufficient deterrent of a party intentionally destroying the best evidence of infringement).

51. The proponent of expert testimony has the burden of demonstrating that the expert is qualified and that the proposed testimony is both relevant and reliable. *See Daubert*, 509 U.S. at 593, n.10; *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 276 (5th Cir. 1998) ("The proponent . . . must prove by a preponderance of the evidence that the testimony is reliable.").

52. "[T]he trial court's gatekeeping function requires more than simply 'taking the experts word for it.'" Advisory Committee Notes, ¶13, Amendment to FED. R. EVID. 702 (effective December 1, 2000) (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1319 (9th Cir. 1995) ("We've been presented with only the experts' qualifications, their

conclusions, and their assurances of reliability. Under *Daubert*, that's not enough.").

53.     Incorrect assumptions critical to an expert's opinionmake that opinion unreliable and inadmissible. *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 279 n.11 276 (5th Cir. 1998) (Under *Daubert*, "any step that renders the analysis unreliable . . . renders the expert's testimony inadmissible. This is true whether the step completely changes a reliable methodology or merely misapplies that methodology.").

54.     A key factor in a court's determination of the reliability of expert testimony is whether the expert has adequately accounted for obvious alternative explanations Advisory Committee Notes, Amendment to FED. R. EVID. 702, ¶4 (effective December 1, 2000) (citing *Claar v. Burlington N.R.R.*, 29 F.3d 499 (9th Cir. 1994).

55.     Expert testimony is properly excluded from experts for whom brief initial summaries are provided even if rebuttal and supplementary disclosures are later served because a scheduling order and Rule 26(a) clearly require that initial disclosures be a complete and detailed report. *See Sierra Club v. Cedar Point Oil Co.,* 73 F.3d 546, 571 (5th Cir. 1996), *cert. denied,* 136 L. Ed. 2d 20, 117 S. Ct. 57 (1996); *see also* FED. R. CIV. P. 26(a)(2)(B) and Advisory Committee's note ("Expert reports must not be

sketchy, vague or preliminary in nature.").

56.    To be relevant, expert testimony must be sufficiently tied to the facts of the case such that it will aid the jury in resolving a factual dispute. *See Daubert*, 509 U.S. at 591 ("Rule 702's 'helpfulness' standard requires a valid connection to the pertinent inquiry as a precondition to admissibility.").

57.    "When an ethical violation is one that would raise questions as to the objectivity, impartiality, or reliability of the proffered testimony, then that violation should result in a presumption in favor of exclusion of that testimony." *The Role of Ethical Norms in the Admissibility of Expert Testimony*, Daniel W. Shuman and Stuart A. Greenberg, 37 Judges J. 1 (1998).

58.    Expert opinions based upon a false premise are fundamentally unreliable. *See Moore*, 151 F.3d at 279 n.11.

59.    Did Defendants post defamatory statements as contained in the Protegga Report.

**B.    Defendants' Contested Propositions of Law**

1.    Whether the alleged defamatory statements are true.

2.    Whether Plaintiffs' consented to the publication of the alleged defamatory statements.

3.    Whether the alleged defamatory statements were legally justified.

4.      Whether Plaintiffs are estopped to deny the truth of the alleged defamatory statements.

5.      Whether Plaintiffs have committed fraud.

6.      Whether any of the alleged claims are the result of Plaintiffs' fault.

7.      Whether the alleged use of Plaintiffs' marks, trade name or trade dress was a fair use or nominative fair use.

8.      Whether Plaintiffs' marks, trade name or trade dress are merely descriptive or generic.

9.      Whether Plaintiffs' marks, trade name or trade dress have acquired a secondary meaning unique to Plaintiffs.

10.     Whether Plaintiffs are equitably estopped to deny the truth of the alleged defamatory statements.

11.     Whether Plaintiffs delayed too long in asserting their claims.

12.     Whether Plaintiffs have unclean hands.

13.     Whether Plaintiffs failed to mitigate their alleged damages.

14.     Whether the conduct complained of was caused by third-parties over whom Defendants have no control or duty/obligation to police.

15.      Whether Plaintiffs waived any of their claims.

16.     Whether Plaintiffs have suffered any damages.

17.     Whether Plaintiffs disclosed any damages.

18.     Whether Plaintiffs' marks, trade name or trade dress meet the registration requirements under Federal trademark law.

19.     Whether the First Amendment to the United States Constitution protects the speech complained of.

20.     Whether the alleged defamatory statements constitute matters of public concern.

21.     Whether Plaintiffs are public figures or limited purpose public figures.

22.     Whether the alleged defamatory statements complained of constitute parody.

23.     Whether Plaintiffs use their marks, trade name or trade dress in an overall effort to mislead their customers about their products and services.

24.     Whether the alleged use of Plaintiffs' marks, trade name or trade dress constitutes fair use or nominative fair use.

25.     Whether the alleged defamatory statements constitute news reporting or commentary.

## X.     LIST OF ANY ADDITIONAL MATTERS THAT MIGHT AID IN THE DISPOSITION OF THE CASE

Currently pending before the Court is Defendants' Motion for Summary Judgment [Doc. 126].

## XI.   WITNESSES

### A.   Plaintiffs' Witness List is attached.

### B.   Defendants' Witness List is attached.

In the event there are any other witnesses to be called at the trial, the names, addresses, and the subject matter of the testimony will be reported to opposing counsel as soon as they are known. This restriction shall not apply to rebuttal or impeaching witnesses, the necessity of whose testimony cannot reasonably be anticipated before the time of trial.

Defendants do not concur in this statement and believes that it contradicts the express direction contained in the Court's Amended Scheduling Order. [Doc. 141]

## XII.   SETTLEMENT

All settlement offers have been exhausted.  The case cannot be settled, and it will have to be tried.

## XIII.   TRIAL

### A.   The probable length of trial is 4-5 days.

### B.   The following logistical problems exist:

Plaintiffs' Logistical Problems

No logistical problems are known.

<u>Defendants' Logistical Problems</u>

No logistical problems are known.

## XIV.  ADDITIONAL REQUIRED ATTACHMENTS

Tab 1 Plaintiffs' Witness List

Tab 2 Defendants' Witness List

Tab 3 Plaintiffs' Proposed Jury Instructions

Tab 4 Defendants' Proposed Jury Instructions

**DATED: _____**          _____

**JORGE A. SOLIS**
**UNITED STATES DISTRICT JUDGE**

Respectfully submitted,

_____/s/ Mark A. Hendrix_____
Mark A. Hendrix   (# 09460500)
**KRAGE & JANVEY, L.L.P.**
2100 Ross Avenue, Suite 2600
Dallas, Texas  75201
214-397-1914
Facsimile:  214-220-0230
Email:      mhendrix@kjllp.com

**ATTORNEYS FOR PLAINTIFFS
T & E INVESTMENT GROUP, LLC d/b/a
ROBERTS INVESTMENT GROUP
AND TIMOTHY ROBERTS**


_____/s/ Ryan K. Lurich_____
Lawrence J. Friedman   (#07469300)
Ryan K. Lurich (#24013070)
R. Brian Shields (#24056310)
**FRIEDMAN & FEIGER, L.L.P.**
5301 Spring Valley Road
Suite 200
Dallas, Texas 75240
972-788-1400
Facsimile:  972-776-5313
Email:      lfriedman@fflawoffice.com
            rlurich@fflawoffice.com
            bshields@fflawoffice.com

**ATTORNEYS FOR DEFENDANTS
CHRISTOPHER FAULKNER,
BREITLING OIL AND GAG CORP.,
PARKER HALLAM and
DUSTIN RODRIGUEZ**

## CERTIFICATE OF SERVICE

I hereby certify that on February 6, 2015, I electronically filed the foregoing document with the clerk of the court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court.  The electronic case filing system sent a "Notice of Electronic Filing" to the following attorneys of record who have consented in writing to accept this Notice as service of this document by electronic means:

    Mark A. Hendrix, Esq.
    Krage & Janvey, L.L.P.
    2100 Ross Avenue, Suite 2600
    Dallas, Texas 75201
    (214) 397-1914 (Telephone)
    (214) 220-0230 (Telecopier)

        /s/ Ryan K. Lurich